# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANGELA AGUIRRE-MILLHOUSE, | |
| Plaintiff, | |
| | No. 13 C 5123 |
| v. | |
| | Magistrate Judge Mary M. Rowland |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Angela Aguirre-Millhouse filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). The parties have filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari,* 155

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.* The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue,* 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

F.Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler,* 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford,* 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on January 5, 2010, alleging that she became disabled on January 11, 2009. (R. at 121–23). She alleges that her disability arises from carpal tunnel syndrome, brought on by an accident on the onset date. (*Id.* at 182). The application was denied initially (*id.* at 110) and on reconsideration (*id.* at 115), after which Plaintiff filed a timely request for a hearing (*id.* at 129). On January 19, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 60–107). The ALJ also heard testimony from Plaintiff's spouse, Micah Millhouse, and Lee O. Knutson, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on January 25, 2012. (R. at 31–33). Applying the five-step sequential process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 11, 2009. (*Id.* at 36). At step two, the ALJ found that Plaintiff had the following severe impairments: status post injury to left upper extremity, mild cervical degenerative disc disease, and obesity. (*Id.*). The ALJ found Plaintiff's depression to be a nonsevere impairment. (*Id.*). At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 38).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she could perform light work as defined in 20 C.F.R. 404.1567(b) "ex-

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

cept she can use her non-dominant left upper extremity for only occasional handling, fingering, feeling, gripping and grasping; she has no additional limitations using her dominant right upper extremity; and she cannot climb ladders, ropes or scaffolds." (R. at 39). The ALJ further noted that "[a]ny work must involve only simple instructions, routine tasks and simple work-related decisions." (*Id.*). Based on this RFC and the VE's testimony, the ALJ concluded at step four that Plaintiff could not perform past relevant work. (*Id.* at 44). Finally, at step five, the ALJ determined based on the VE's testimony that sufficient jobs exist in the national economy based on Plaintiff's age, education, work experience and RFC. (*Id.* at 45). Specifically, the ALJ found that Plaintiff could work as an information clerk, an usher, or a parking lot attendant. (*Id.* at 45). Accordingly, the ALJ found that Plaintiff was not under a disability as defined by the Act from the alleged onset date through the date of her decision. (*Id.* at 46).

The Appeals Council denied Plaintiff's request for review on May 17, 2013. (R. at 16). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue,* 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart,* 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin,* 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin,* 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. FACTUAL BACKGROUND

On January 11, 2009, Plaintiff slipped on ice and sustained a closed fracture of the carpal bone. (R. at 404–05). On January 21, 2009, Jonathan Wigderson, D.O., an orthopedic surgeon, performed surgery to repair the left wrist fracture. (*Id.* at 367). After the surgery, Plaintiff reported to Dr. Wigderson that she was experiencing tingling in her left thumb, index finger and middle finger. (R. at 420). He diagnosed her with left acute postoperative carpal tunnel syndrome. (*Id.*). On February 6, 2009, Plaintiff had carpal tunnel release surgery to address these issues. (*Id.* at 325).

At a follow-up appointment with Dr. Wigderson on February 17, 2009, she reported some improvement but continued paraesthesias (tingling or burning) throughout her hand and fingers and stiffness. (R. at 422). In March and April follow-up appointments, she reported no improvement, but some improvement in May through July. (*Id.* at 423–30). She continued physical therapy throughout this time. (*Id.*). At her July follow-up appointment, Dr. Wigderson advised that further surgical intervention may be required, and ordered an EMG which showed bilateral carpal tunnel syndrome with the left worse than the right. (*Id.* at 430–32).

In August 2009, Plaintiff saw a neurologist, Angela Benavides, M.D., to examine her ongoing stiffness, weakness, pain and numbness in her left hand. (R. at 464). The neurologist ordered an EMG, which showed bilateral carpal tunnel syndrome,

worse on the left than on the right. (*Id*. at 467). By October, Plaintiff's condition had not improved significantly, and she was referred to a surgeon. (*Id*. at 439). On January 12, 2010, Plaintiff underwent revision carpal tunnel release surgery. (*Id*. at 527–29).

On February 9, 2010, Plaintiff's occupational therapist, Kathy Southworth, OTR, CHT, provided a report, noting some improvement but continued pain and other symptoms. (R. at 521). That report noted Plaintiff's left hand strength was almost two-thirds less than her right hand strength, and that her pain reached 8/10 when using her hand. (*Id*.).

Plaintiff saw Dr. Goran Tubic, M.D., a pain specialist, in May 2010. (R. at 584). Plaintiff reported that her best pain score was 5 out of 10, and her worst was 10 out of 10. (*Id*.). Dr. Tubic prescribed Ultram and Neurontin, and a stellate ganglion block/local anesthetic injection.[3] (*Id*.). At a June 2010 follow-up, her worst pain had decreased to 7, but she reported that the stellate ganglion block did not help at all, and that the pain medications were not working enough. (R. at 582). Dr. Tubic prescribed Norco and Topamax at that visit. (*Id*. at 583). On June 30, 2010, Plaintiff had a steroid injection, and reported that it gave her about 25% relief for four days. (*Id*. at 579). In July 2010, she reported that her medications were either completely ineffective or only marginally helpful. (*Id*.). At that time, Dr. Tubic increased the Topamax prescription and prescribed Percocet. (*Id*. at 580). At Plaintiff's October

---

[3] *Stellate Ganglion Block*, OhioHealth MedCentral Hospitals, www.medcentral.org/Main/StellateGanglionBlock.aspx (last visited Mar. 16, 2015).

2010 follow-up, she reported some improvement: her last steroid injection was 60% effective for 20 days, with her worst pain score down to 6. (*Id.* at 701).

At a January 2011 follow-up, Plaintiff reported that medication only "takes the edge off" her symptoms, that Topamax causes drowsiness, and that she feels "very tired" on Percocet. (R. at 698). In April 2011, Dr. Tubic noted the steroid injections were having better effects than in 2010: about 50% pain relief for about 3 weeks. (*Id.* at 692). Plaintiff continued to report drowsiness from her medication and a pain score of 7. (*Id.*). In October 2011, a pain specialist at Rush Pain Center prescribed Ultram and Lyrica. (R. at 871). Another stellate ganglion block was performed, this time producing some improvement in stiffness but not in pain. (*Id.* at 874). In November 2011, another stellate ganglion block was performed, this time with no improvement. (*Id.* at 876). Plaintiff continued to report a pain score of 7. (*Id.*). A December 16, 2011 follow-up showed some improvement (reported as 10% overall since beginning treatment), but her pain score remained at 5 and her allodynia score was 10.[4]

At the Social Security hearing, Plaintiff reported that her medications had been switched recently due to side effects of her previous medication, including crying spells brought on by Lyrica. (R. at 76). However, she also reported that two of the medications she recently switched to, Cymbalta and Tramadol, also cause significant side effects. (*Id.* at 75–76). Specifically, Cymbalta makes her "feel like [her]

---

[4] Allodynia refers to hypersensitivity, or pain due to stimulus that would not normally be painful. *Allodynia*, Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/allodynia (last visited Mar. 16, 2015).

mind is just in the clouds" and Tramadol makes her "very sleepy." (*Id.*). She reported difficulty sleeping through the night, and frequent napping during the day. (*Id.* at 89). Most mornings, after preparing her children for school, she takes her medication and goes back to sleep. (*Id.* at 79). She does not take her medicine until after her kids get on the school bus because she does not want to be groggy when the kids are home. (*Id.*). She further reported that even with the assistance of her pain medications, her pain score is generally in the 5–7 range, and sometimes up to 10 or "unbearable." (*Id.* at 72–73). Moreover, she testified that she cannot always cook (*id.* at 79), it takes her three to four days to put away a load of laundry (*id.* at 81–82), she cannot do crafts (*id.* at 82), she can only use a computer for 20 minutes or so at a time (*id.*), and her family uses disposable plates because it is too difficult for her to wash dishes (*id.* at 86–87). She also has difficulty with personal care activities such as bathing and dressing. (*Id.* at 231, 245).

## V. DISCUSSION

### A. Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Failed To Meet the Criteria for Listings 1.02 or 1.07

At step three, the ALJ determined that during the relevant time period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. at 38–39). Specifically, the ALJ concluded:

> In making this determination, I have reviewed each of the relevant listings, including listing 1.02 and 1.07. The medical evidence does not document listing-level severity to the criteria of any listed impairment, individually or in combination. I note that the evidence does not estab-

lish an inability to perform fine and gross movements effectively, or non-union of the upper extremity.

(*Id.* at 38). Plaintiff challenges the validity of the ALJ's determination, arguing that the ALJ's determination was perfunctory and failed to refer to any record support whatsoever. (Plt. Br. at 8). The Court disagrees.

Although the ALJ's step three determination was limited to two paragraphs, the ALJ provided a discussion of Plaintiff's severe and nonsevere impairments, the objective medical evidence, and Plaintiff's credibility directly after step three when the ALJ determined Plaintiff's RFC. "This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

Plaintiff has failed to meet her burden to demonstrate that her impairments satisfy all the requirements of Listing 1.02. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). The medical evidence supports the ALJ's determination. Listing 1.02, *Major Dysfunction of a Joint*, requires the inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02. The regulations define "inability to ambulate effectively" as "an extreme limitation of the

ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Thus, ineffective ambulation means "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* (citation omitted). While the ALJ accommodated Plaintiff's exertional limitations by limiting her left upper extremity to only occasional handling, fingering, feeling, gripping and grasping, and precluded her from climbing ladders, ropes or scaffolds (R. at 39), Plaintiff has not demonstrated an inability to ambulate effectively as contemplated by the regulations. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4) ("The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented.").

Similarly, Plaintiff has failed to meet her burden to demonstrate that her impairments satisfy all the requirements of Listing 1.07, *Fracture of an Upper Extremity*. "Listing 1.07 requires a claimant to have both a fracture and a nonunion of the fracture in order to be considered disabled at step three." *Puleo v. Astrue*, No. 09 C 5262, 2011 WL 833606, at *5 (N.D. Ill. Mar. 4, 2011). Plaintiff has not identified, and the Court has not found, any evidence to suggest that fracture to her carpal bone did not heal.[5] Indeed, as the ALJ noted, subsequent x-rays demonstrated a healed fracture. (R. at 40, 425).

---

[5] When a broken bone fails to heal it is called a "nonunion." American Academy of Orthopaedic Surgeons, *see* orthoinfo.aaos.org/topic.cfm?topic=A00374

In sum, Plaintiff has not met her burden of demonstrating that she meets all of the criteria for Listings 1.02 or 1.07. *See Ribaudo*, 458 F.3d at 583. The ALJ's step three determination is supported by substantial evidence.

## B. The ALJ's Credibility Determination is Patently Wrong

Plaintiff argues that the ALJ's credibility determination is erroneous. (Dkt. 22, Plt. Br. at 11). An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano,* 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96–7p. "[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano,* 556 F.3d at 562 (citing SSR 96–7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support the claimant's credibility. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96–7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining

physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96–7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96–7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

### 1. *The ALJ Improperly Discredited Reports of Disabling Pain*

Plaintiff testified that she is in pain every day, and has been since her accident in 2009. (R. at 72). She stated that her pain is normally between 5 and 7 on a 10-point scale, but reaches 10 often; she has a limited range of motion in her left hand, and that using it exacerbates her pain. (*Id.* at 72–73, 87). She cannot drive for more than twenty-five to thirty minutes (*id.* at 68); standing or walking causes her pain (*id.* at 80); lifting a gallon of milk with her left hand would cause too much pain (*id.*); and putting socks together or hanging laundry is difficult. (*Id.* at 81). Plaintiff further testified that she can only use a keyboard for 20 minutes at a time before her pain becomes excessive (*id.* at 82), and that she becomes too distracted and forgetful to manage paying household bills (*id.* at 83). She testified that the steroid in-

jection she received on the day of the hearing had no effect on her pain whatsoever. (*Id.* at 84). Plaintiff's husband noted that she can only use a computer for about ten minutes before it became too painful. (*Id.* at 95–96).

The ALJ found Plaintiff's reports of disabling symptoms not credible and noted the following:

> Regarding the claimant's left arm injury and subsequent pain and associated alleged limitations, the medical evidence demonstrates ongoing treatment since the alleged onset date. However, the medical evidence indicates that the claimant's functioning improved with treatment.

(R. at 40).

The ALJ's analysis is legally insufficient. The ALJ's focus on improved functioning with treatment ignores the fact that Plaintiff has not reported significant improvement in her pain. The ALJ has constructed a narrative of slow but steady improvement in Plaintiff's condition. (R. at 40–41). To do so, she selectively points to evidence that supports this narrative, while disregarding evidence to the contrary. For example, the ALJ states that "[i]n April 2011, [Plaintiff] reported that Percocet worked well for her pain and caused only mild drowsiness." (*Id.*). Although not included in the ALJ's assessment, that medical record further notes that Plaintiff can only take Topamax at night because it causes drowsiness, other medications have been ineffective, and Plaintiff's pain score at the time of that consultation was 7 out of 10 despite her medications. (*Id.* at 692). Similarly, the ALJ notes that the steroid injections received in late 2010 and early 2011 helped improve the pain. (R. at 41). However, the ALJ failed to note the fact that Plaintiff reported a higher pain score

of 7 in November 2011 than in June 2010 (pain score 5), despite those treatments. (*Id.* at 582, 876). Moreover, the ALJ does not address the fact that Plaintiff's testimony contradicts the ALJ's assessment that Plaintiff had steadily improved. At the hearing, Plaintiff noted a pain score continues to reach 10 or become "unbearable" on a frequent basis, (*id.* at 73), and the steroid injection taken on the date of the hearing had no effect at all. (*Id.* at 84). "Although the ALJ need not discuss every piece of evidence in the record, [s]he must confront the evidence that does not support [her] conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474 (citation omitted). The ALJ's failure to evaluate evidence that potentially supports Plaintiff's claim "does not provide much assurance that [s]he adequately considered [Plaintiff's] case." *Ribaudo*, 458 F.3d at 584.

Moreover, an ALJ may not adversely assess a claimant's credibility based on "the ALJ's own spin on the medical record" or by taking a "sound-bite" approach in evaluating the record. *Czarnecki v. Colvin*, 595 F. App'x 635, 644 (7th Cir. 2015). After selectively citing those portions of the record that show improvement, the ALJ concludes that "[w]hile the records demonstrate some continued pain in her left hand, her functioning has improved." (R. at 41). But Plaintiff's testimony clearly states that her pain has not improved and she continues to have the highest pain score. Given the ALJ's highly selective representation of the record, the Court is not persuaded that the ALJ gave due consideration to the record before subsequently concluding that "[t]he medical evidence does not support any further limitations to the claimant's work-related abilities due to her left arm impairment." (R. at 41). On

remand, the ALJ must evaluate "the entire case record," *Arnold,* 473 F.3d at 823, and "confront the evidence that does not support [her] conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474.

### 2. The ALJ Improperly Discredited Plaintiff's Testimony About Her Medication Side Effects

At the hearing, Plaintiff testified that she is unable to function on her medications. She stated that her medications cause her to be drowsy, distracted and depressed; she does not sleep through the night; and she naps off and on frequently all day. (R. at 75–76, 89). She reported that some cause her to cry uncontrollably, while others put her to sleep. (*Id*. at 76–77). She stated that she waits until her children have left for school before taking her medications, because the side effects are too extreme for her to effectively prepare her children for school. (*Id*. at 79). Plaintiff's husband corroborated this testimony and noted that her medication side effects are too severe for her to take her medications when their kids are home. (*Id*. at 95–96).

None of this testimony is addressed in the ALJ's opinion. "[A]n ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, and justify the finding with specific reasons," *Villano*, 556 F.3d at 562. On remand, the ALJ must either accept the evidence of Plaintiff's medication side effects and incorporate them into her analysis, or "confront the evidence . . . and explain why it was rejected." *Indoranto*, 374 F.3d at 474.

### 3. The ALJ Improperly Assessed Plaintiff's Daily Activities

The ALJ's dismissal of Plaintiff's credibility based on her daily activities is not supported by substantial evidence. The ALJ presented the following overview of Plaintiff's daily activities:

> [Plaintiff] reports that she takes care of her three children, including making their breakfast and getting them ready for school in the morning. The claimant prepares simple meals. She also vacuums once per week, irons clothes as needed, loads the dishwasher and digs weeds in the garden. The claimant drives. The claimant goes shopping, including shopping for groceries, with her husband or mother-in-law.

(R. at 42) (internal citations omitted).

The ALJ then concluded that "the evidence indicates that the claimant retains the ability to use her left upper extremity for some activities and does not support her allegation that she is unable to work." (R. at 42).

While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir.2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

Here, the ALJ did not adequately explain how Plaintiff's ability to perform limited household activities undermines her credibility of pain. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Even more concerning is that in discussing Plaintiff's daily activities, the ALJ misrepresented many of Plaintiff's limitations in performing those daily activities. The ALJ points out that Plaintiff prepares her children for school in the morning (R. at 42), but fails to note that Plaintiff does not take her medication until after she has sent her children to school because she would otherwise be too groggy; once she does take her medication after they leave, she generally goes back to sleep (*id.* at 79). The ALJ points out that Plaintiff prepares simple meals (*id.* at 42), but fails to note that it "depends on how [she's] feeling that day" and that otherwise her husband cooks or they order in (*id.* at 79–80). The ALJ states that Plaintiff "irons clothes as needed" (*id.* at 42), but fails to note that it takes Plaintiff three to four days to put away a load of laundry (*id.* at 81–82). An ALJ cannot disregard a claimant's limitations in performing household activities. *Moss*, 555 F.3d at 562 (noting the ALJ ignored numerous qualifications regarding Plaintiff's daily activities: "while washing dishes she shifts her weight to the left but still experiences pain; when she last went to the store she had to use the cart for support and was unable to stay long; and when she last tried to drive the family vehicle more than a year before the evidentiary hearing, she had difficulty pushing the pedals because of a lack of control or feeling in her foot").

Further, the ALJ ignores statements that Plaintiff no longer manages the household bills and that her husband handles these tasks because Plaintiff becomes too forgetful and distracted. (R. at 83). The ALJ also drew attention to the fact that at her hearing, Plaintiff operated her cellphone and lifted her purse using her left upper extremity. (*Id.* at 42). However, the ALJ did not ask Plaintiff whether she was having a good day or a bad day on that occasion, did not note the size or weight of these objects, and did not ask whether these activities were causing any pain. On remand, the ALJ must consider Plaintiff's daily activities with proper consideration for Plaintiff's testimony on how those activities are limited by her impairments, and without giving those activities undue weight. *Moss*, 555 F.3d at 562.

## B. The ALJ's Step-Five Determination is Flawed

At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including work as an information clerk, an usher, or a parking lot attendant. (R. at 45–46). The VE testified that there were 4,700 information clerk jobs in Illinois and 120,000 jobs nationally, 200 usher jobs in Illinois and 5,300 jobs nationally, and 255 parking lot attendant jobs in Illinois and 6,200 jobs nationally. (*Id.* at 100–01). But when Plaintiff's counsel asked the VE for the sources of his job estimates, the VE stated that he "extrapolated" the estimates from raw numbers provided by the Bureau of Labor Statistics "based on [his] knowledge of the DOT, the physical demands and skill level and realizing that not all jobs are exactly like one DOT number." (*Id.* at 102–04). When

pressed, the VE acknowledged that he was unable to provide counsel with "the sources that support the numbers" to which he testified. (*Id.* at 105).

An ALJ cannot rely on a VE's testimony that does not fully explain the source of the expert's estimate of the number of jobs that a claimant can perform. *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) ("We also have no idea what the source or accuracy of the number of jobs that vocational experts . . . claim the plaintiff could perform that exist in the plaintiff's area, the region, or the nation."). If the VE is relying on his personal knowledge of the labor market, he must "explain how impressions from unspecified past experience and 'knowledge' could enable him to determine numbers of particular jobs [and] reveal what surveys he had relied upon and what they had shown." *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014). On remand, if the ALJ relies on VE testimony, she shall confirm that the testimony is supported by substantial evidence.[6]

---

[6] Plaintiff also contends that the ALJ failed to include Plaintiff's mental illness and the combination of Plaintiff's impairments in her step two determination. (Plt. Br. at 5–7). But "[a]s long as the ALJ determines that the claimant has one severe impairment, the [regulations require the] ALJ [to] proceed to the remaining steps of the evaluation process." *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010); *see* 20 C.F.R. § 404.1523. "Therefore, the step two determination of severity is merely a threshold requirement." *Castile*, 617 F.3d at 927. Here, the ALJ correctly applied this rule—she found at step two that Plaintiff had three serious impairments and moved on to the remaining steps in the evaluative process. *See Curvin*, 778 F.3d at 648 ("The ALJ correctly applied this rule. He found that Curvin had one severe impairment, *viz.*, the glaucoma in her right eye, and proceeded to the remaining steps in the evaluation process.").

## C. Summary

Because the Court is remanding on the credibility and step-five issues, the Court chooses not to address Plaintiff's argument that the ALJ erred in her RFC determination. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [21] is **GRANTED** and Defendant's Motion for Summary Judgment [26] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: June 15, 2015

_Mary M Rowland_

MARY M. ROWLAND
United States Magistrate Judge